Filed 7/21/21  P. v. Glass CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DONOVAN GLASS,<br><br>    Defendant and Appellant. | 2d Crim. No. B307104<br>(Super. Ct. No. 20PT-00369)<br>(San Luis Obispo County) |

In *People v Turner* (2020) 10 Cal.5th 786, our Supreme Court held that an expert may rely upon, quote and base their opinion upon otherwise admissible documents.  But the documents must be offered and admitted in the proceeding.  (*Id.*, at pp. 823-824.)  *Turner* explained:  "Had the report been offered and admitted under an exception, the words of the document itself would have constituted admissible hearsay.  [The expert's] recitation of the content of an *unadmitted* document remains hearsay for which no exception was established.  [The expert]

was allowed to present inadmissible hearsay as true and supportive of her opinion. This was error under California's hearsay statutes." (*Id.*, at p. 823.) Such is the error in the instant matter.

Donovan Glass appeals the trial court's order recommitting him for treatment as a mentally disordered offender (MDO). (Pen. Code, § 2970 et seq.)[1] Appellant contends the evidence is insufficient to support the finding that appellant met the recommitment criteria (§ 2972, subd. (c)). Although the People presented expert opinion testimony supporting the criteria, the court prejudicially erred by allowing the expert to repeatedly convey case-specific hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Accordingly, we reverse.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant was first committed as an MDO in 2018. On May 5, 2020, the Board of Parole Hearings (BPH) found that appellant met the requirements for recommitment under section 2962.

Appellant petitioned for a court hearing under section 2966, subdivision (c). The parties waived a jury. Dr. Roxanne Rassti and appellant testified.

*Dr. Rassti's Testimony*

Dr. Rassti, a forensic psychologist at Atascadero State Hospital (ASH), is tasked with examining patients to determine if they qualify as MDOs. The parties stipulated that Dr. Rassti is an expert in psychology and is familiar with the MDO statutes.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

2

Dr. Rassti had previously evaluated appellant. In assessing his current psychological status, Dr. Rassti examined police and sheriff's reports concerning a February 2017 assault and an October 2017 criminal threat, previous MDO evaluations of appellant by other doctors and ASH records describing appellant's daily behavior and his "numerous" serious incident reports. Dr. Rassti personally interviewed appellant and spoke with his treating psychiatrist and psychologist.

When Dr. Rassti was asked to relay case-specific hearsay in the ASH records, appellant raised a *Sanchez* objection, arguing Dr. Rassti was not permitted to convey the underlying facts of appellant's verbal and physical outbursts at ASH. The People contended the testimony was proper because the ASH records fall within the business records exception to the hearsay rule (Evid. Code, § 1271). The trial court agreed the exception applied and allowed the testimony. The People chose not to admit the "voluminous" ASH records, asserting it was more practical to have Dr. Rassti recount their factual content.

Dr. Rassti concluded that appellant met the three criteria for MDO recommitment under section 2972, subdivision (c).[2] First, she opined that as of the May 5, 2020 BPH hearing, appellant continued to suffer from a severe mental disorder, i.e.,

---

[2] Section 2972, subdivision (c) states, in relevant part: "If the court or jury finds that the patient has a severe mental health disorder, that the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and that by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed . . . ."

3

schizoaffective disorder. She noted appellant's history of auditory hallucinations, paranoia, delusional ideations, manic episodes, extreme hostility, thought disorganization, and disorganized behavior, as well as his belief that he can communicate with people on television and direct their activities, that he can read other people's minds and that they could read his mind, and that a scar on his forehead caused the problems in his life.[3]

Dr. Rassti testified that these signs and symptoms of appellant's severe mental disorder were not controlled by treatment as of May 5, 2020. In the preceding months, those symptoms caused him to engage in verbal altercations with hospital staff and patients. In February 2020, he made Hitler salutes in front of African American patients, drew swastikas and made inappropriate comments to female staff members. In March 2020, he had three altercations with staff, drew swastikas on his hand and smeared Vaseline on his face. Dr. Rassti believed the Vaseline was connected to his belief about the scar on his forehead.

In April 2020, appellant was prescribed Zoloft. Although his mood improved, he had five more altercations with staff and patients and continued to exhibit paranoia and irritability.

During their May 4, 2020 interview, appellant told Dr. Rassti that he felt better due to the Zoloft but had some strange experiences that week, which he attributed to the scar on his forehead. He said that when other people looked at his scar or touched the same spot on their own foreheads, they were sending him messages or negatively affecting his life.

---

[3] Dr. Rassti could not see a scar on appellant's forehead but admitted she may not have been close enough to see it.

Second, Dr. Rassti opined that appellant was not in remission as of the BPH hearing date, and that he could not be kept in remission without treatment. She based that opinion on appellant's conduct during the year preceding the 2020 BPH hearing.

On May 23, 2019, appellant argued with staff during a routine contraband search, yelling "Fuck you, bitch. Shut the fuck up and search my room." When put in restraints, he violently struggled and yelled racial comments. On July 21, 2019, appellant extended his arm and yelled, "White power." When counseled about this, appellant said, "You're going to die, bitch," and lunged toward a staff member. When staff members restrained him, he yelled, "You are going to die. You fat, wetback piece of shit," and "You wetback, whore, slut, I'm going to kill you."

The next day appellant told a staff member, "I'll fuckin' spit on you mother fucker. I'll fuckin' kill you, nigger. . . . You're a faggot. I'm going to kill you mother fucker." When staff members attempted to restrain him, appellant kicked a staff member and shouted, "I'm going to kill you mother fuckers. I didn't do anything. You were torturing me mother fuckers."

On October 5, 2019, appellant instigated a mutual, physical fight with another patient. On January 28, 2020, during a meeting about his behavior, appellant told staff members, "What do you want dog? You're a dog because you look like one." He became increasingly agitated and said, "I will kill you. I will split your throat. I will kill all you mother fuckers." When staff members restrained appellant, he yelled, "I will kill all of you wetback niggers. I'll fuck you up right now. Let's go you stupid

fat bitches. I'm going to kill all of you. Watch me you nigger fuckers. I will spit in your face right now."

On February 9, 2020, appellant referred to a female staff member as his girlfriend, grabbed her by the arm, and said, "Why not." On February 20, 2020, appellant again threatened to kill a staff member.

In March 2020, appellant threatened to kill two other patients in separate incidences. On April 2, 2020, another patient bumped into appellant, apologized and tried to shake appellant's hand. Appellant responded, "Fuck you, I'm not shaking your hand. Next time that happens, I'm going to fuck you up."

On April 10, 2020, during an argument, appellant told another patient, "I'll kick your ass, you fat bitch," and said "fuck you" to a staff member who intervened. On May 5, 2020, appellant broke a shower head after being told that he had spent too much time in the shower.

According to Dr. Rassti, the cause of most of appellant's behavioral problems was paranoia, rooted in psychotic thought processes. She opined that appellant could not be kept in remission without treatment. During the year before his BPH hearing, appellant was less cooperative with his treatment than is reasonable. His group attendance was 67 percent, well below the recommended minimum 80 percent attendance rate. Appellant also intermittently refused his medications between November 2019 and April 2020.

Lastly, Dr. Rassti opined that appellant represented a substantial danger to others because of his severe mental disorder. She based that opinion on appellant's two qualifying

convictions, his conduct in prison and his behavioral history at ASH.

Prison records showed that in November of 2018, appellant was placed in a prison psychiatric facility after "threatening and profaning while demonstrating psychiatric symptoms." Dr. Rassti explained that appellant's behavioral incidents in the hospital during the past year were driven by his psychiatric condition and that he "has an increased risk for violence when his symptoms are not in remission."

Although appellant had displayed some insight into his disorder and the benefits of his medication during his interview with Dr. Rassti, he was only able to discuss some of his symptoms and he still intermittently refused his medication. Dr. Rassti noted that appellant's noncompliance "suggests that he does not truly have adequate insight into his mental illness or th[e] role of his medication in managing [his] symptoms," and that his violent criminal history and history of substance abuse further exacerbate his risk of recidivism and violence.

*Appellant's Testimony*

Appellant testified that when he first arrived at ASH he felt suicidal and "that's why a lot of the incidents did happen." Nevertheless, he denied having said "most of that stuff," evidently referring to the incidents described by Dr. Rassti. Appellant said his mood improved greatly once he was prescribed Zoloft and claimed that his group attendance rate was now 98.2 percent, that he was doing a lot of chores in his unit, that he was getting along well with his peers and that he missed his medication only once since May 1 or June 1, 2020. Appellant apologized for acting up, said he had learned his lesson and promised to do his best to be safe in the community.

DISCUSSION

Appellant contends the bulk of Dr. Rassti's testimony regarding his conduct at ASH was inadmissible hearsay. He claims the hearsay testimony was necessarily prejudicial because it was the only evidence of the incidents Dr. Rassti relied upon to support her opinion that appellant met each of the MDO recommitment criteria.

The People acknowledge that the facts relayed by Dr. Rassti were based on a hearsay source but argue the trial court properly found that the ASH records met the foundational requirements for admission under the business records exception to the hearsay rule. (See Evid. Code, § 1271.) Even assuming this is true, the failure to offer and *admit* the records into evidence rendered Dr. Rassti's recitation of their content "hearsay for which no exception was established." (*Turner*, *supra*, 10 Cal.5th at p. 823.)

An expert witness testifying at an MDO hearing cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez*, *supra*, 63 Cal.4th at p. 686; see *People v. Bona* (2017) 15 Cal.App.5th 511, 520 [recognizing *Sanchez* applies in MDO proceedings].) Accordingly, an expert "is generally not permitted . . . to supply case-specific facts about which he [or she] has no personal knowledge." (*Sanchez*, at p. 676.) Case-specific facts are "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*)

In *People v. Yates* (2018) 25 Cal.App.5th 474 (*Yates*), the case-specific facts related by the experts were taken from the defendant's "criminal, juvenile and state hospital records – that

8

were neither introduced or admitted into evidence, nor shown to fall within a hearsay exception." (*Id.*, at p. 485.) The Court of Appeal rejected the argument that it was not necessary to admit the documents because *Sanchez* allows an expert to rely on hearsay. (*Ibid.*) Although some of the documents would have been admissible if introduced under section 6600, subdivision (a)(3) as predicate offense information, the fact that the records were not properly introduced and admitted prevented the experts from testifying as to their contents. (*Yates*, at pp. 485-486.)

Regarding the state hospital records, *Yates* noted that "the mere fact [they] had been subpoenaed did not make their entire contents reliable or otherwise admissible as business records." (*Yates*, *supra*, 25 Cal.App.5th at p. 486.) The court explained: "[T]here was no blanket hearsay exception for the experts' testimony to the case-specific hearsay contained in documents which were neither presented to the court for an evidentiary ruling nor admitted into evidence. Admission of expert testimony relating case-specific hearsay to the jury that was neither subject to a hearsay exception nor independently established by competent evidence was error." (*Ibid.*)

As previously discussed, our high court clarified in *Turner* that it is the admission of a hearsay document under an exception that allows the expert to relate the case-specific content of that document. (*Turner*, *supra*, 10 Cal.5th at p. 823.) The expert in that case, Dr. Lisa Scheinin, was permitted to testify regarding the content of a fetal autopsy report prepared by another doctor. The People conceded the report was hearsay but argued it could have been admitted as a business or official record. (*Ibid.*) The Court rejected this argument because it was not presented to the trial court but observed that "[h]ad the

9

report been offered and admitted under an exception, the words of the document itself would have constituted admissible hearsay. Dr. Scheinin's recitation of the content of an *unadmitted* document remains hearsay for which no exception was established." (*Ibid.*)

It is undisputed that appellant's ASH records were not offered or admitted into evidence. The Deputy District Attorney informed the trial court that the records had been subpoenaed to the court, which had "physical possession of the records that could be admitted," but said "it just . . . wouldn't be practical because they would be too voluminous." The trial court responded: "I'll take you for your word. I haven't seen the records. But I usually don't for [these] petition trials."

We are not persuaded by the People's argument that the trial court's finding that the ASH records fall within the business records exception to the hearsay rule was sufficient to permit Dr. Rassti to testify as to their content. Dr. Rassti related case-specific hearsay from documents that were not admitted into evidence, offered into evidence or even viewed by the court, and thus her recitation of their content "remains hearsay for which no exception was established." (*Turner*, *supra*, 10 Cal.5th at p. 823.) As in *Turner*, "[t]his was error under California's hearsay statutes." (*Ibid.*)

The People do not assert that any error in allowing the case-specific hearsay was harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 837; *People v. Duarte* (2000) 24 Cal.4th 603, 618-619.) Dr. Rassti's testimony demonstrated that appellant's conduct at ASH involved significant physical aggression, racial slurs and oral threats against staff and patients occurring over a substantial period. In recommitting appellant, the trial court

10

noted appellant was improving on medication, but found that the court had to "look at what you've done at the state hospital. How you've behaved." We agree with appellant that the MDO recommitment order is based primarily upon inadmissible hearsay evidence regarding his ASH behavior and that such evidence was so pervasive and inflammatory that it prejudicially influenced the trial's outcome. Although Dr. Rassti briefly discussed her interview with appellant, that testimony alone was insufficient to support the recommitment.

Because the MDO scheme is civil in nature, however, double jeopardy does not apply. (*People v. Francis* (2002) 98 Cal.App.4th 873, 877.) Thus, the matter may be retried at the People's discretion. (See, e.g., *People v. Dodd* (2005) 133 Cal.App.4th 1564, 1571, fn. 3.)

DISPOSITION

The MDO recommitment order is reversed and the matter is remanded for further proceedings.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

I concur:

TANGEMAN, J.

11

YEGAN, Acting P. J., Dissenting.

I respectfully dissent. The majority opinion is obedient to the letter of the law recently announced by the Supreme Court in *People v. Turner* (2020) 10 Cal.5th 786. But there is no "structural error" in this case and reversal is not appropriate. In my view, applying this new opinion as a basis for reversal in this case, is an exultation of form over substance. The hospital records delineating appellant's misbehavior were physically in the courtroom and the only reason they were not introduced is because they were "voluminous." The trial court had access to them and since the expert had read and considered them, it saw no need to go with the original source. There is no question but that the expert opinion was based upon the records to some degree. But it was not based solely upon the records. Putting the records aside, the expert consulted with appellant's treating psychologist, consulted with his treating psychiatrist, did her own assessment, and interviewed appellant before forming and expressing her opinion to the trial court. This was not her first interview of appellant. She was well-acquainted with appellant and his activities at the MDO program.

To his credit, appellant himself acknowledged his problems at the hospital, said he was doing better, and apologized for his behavior. He said that "a lot of the incidents did happen." This corroborates the expert testimony concerning the incidents, his assaultive behavior, that did happen. Is not this some evidence supporting the trial court's order? Appellant's apology appears to be sincere. Implied therein is the reasonable inference that appellant knows he needs additional time in the program before release into the community. There is no miscarriage of justice here and the error is harmless by any standard of appellate

review.  It is a virtual certainty that retrial will produce the same result.

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

2

Hernaldo J. Baltodano, Judge

Superior Court County of San Luis Obispo

_____

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Colleen M. Tiedemann, Deputy Attorney General, for Plaintiff and Respondent.