Filed 5/19/25  P. v. Baker CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JAMES ANTHONY BAKER, <br><br> Defendant and Appellant. | B335581 <br><br> (Los Angeles County Super. Ct. No. GA114776) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell S. Mavis, Judge.  Affirmed.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Melanie Dorian, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant James Anthony Baker (defendant) of two counts of making criminal threats and one count of misdemeanor hit-and-run driving. We are asked to decide whether there is substantial evidence that the victims of defendant's threats experienced the requisite sustained fear and whether, as defendant claims, the trial court improperly imposed a high term sentence to punish him for exercising his right to a jury trial.

## I.  BACKGROUND

### A.  *The Offense Conduct, as Established by the Evidence at Trial*

Sally S. (Sally) was driving her cousin, James R. (James), to his home in Burbank on June 11, 2023. Around 1:38 p.m., Sally stopped at a red light at the intersection of San Fernando Boulevard and Grismer Avenue.

As depicted in video from a traffic camera maintained by Burbank's Department of Public Works, defendant pulled his car away from a nearby street curb and struck Sally's rear bumper. Sally and defendant both got out of their cars; James initially remained in Sally's car but he later exited the car when a confrontation ensued.

Sally asked defendant for his driver's license and insurance information. Defendant replied, "You're really going to try to get a few bucks off of me, you hungry ass bitch?" Sally replied, "Are you serious? You just rear-ended me." Defendant said he was serious and called Sally "dumb bitch," "fat bitch," and "stupid bitch." James then got out of Sally's car and told defendant to stop calling Sally names. According to Sally and James, defendant approached James and "press[ed] up against" him or

got "into [his] face." Sally heard defendant say "he had his gun in his car" and "would shoot us and drop us both." James also heard defendant say he was going to shoot him and Sally.[1]

At defendant's later criminal trial, Sally was asked how she felt "[a]t the moment that . . . defendant threatened to shoot [her] and [James]." She testified she was "[s]cared" and believed defendant's threat. Sally told James to get back into her car, took a photo of defendant's license plate, drove away, and continued to look at defendant's car to confirm he was not following her. She did not immediately call for help "[b]ecause [she] was scared in that moment and just wanted to get to a safer area." But she did call 911 when she arrived at James's home approximately 10 minutes after the collision. A police detective that responded to the 911 call within an hour of Sally's confrontation with defendant observed she was "a little upset" and "[s]eemed very concerned."

James was also asked, at defendant's later criminal trial, whether he was scared for his or Sally's safety "[i]n that moment when [defendant] threatened to shoot you." James answered, "Absolutely, yes," and explained he "didn't know what [defendant] had in his car. He kept going back to his car." (The video footage of the incident does show defendant walking to the driver's door of his vehicle several times during the encounter.) James also watched defendant's car as he and Sally were driving away "[j]ust in case [defendant] was following [them]." The

---

[1] The traffic video indicates approximately two minutes elapsed between the moment Sally got out of her car and the moment she and James drove away.

responding police detective also observed James "appeared upset" when she arrived to take a report.

Defendant was arrested a few weeks after the incident. Detective Kristianna Sanchez of the Burbank Police Department and a colleague interviewed defendant. At trial, Detective Sanchez testified to some of defendant's statements and the jury viewed video of other portions of the interview. Among other things, defendant denied threatening to shoot anyone.

### B.    *Verdict and Sentencing*

After the presentation of evidence, the trial jury convicted defendant of two counts of making criminal threats (Pen. Code,[2] § 422)—one count for each of Sally and James—and one count of misdemeanor hit-and-run driving (Veh. Code, § 20002, subd. (a)). Defendant admitted sustaining a prior Three Strikes law conviction and two other prior felony convictions; he also admitted other sentencing enhancement facts. As we later discuss in more detail, the trial court imposed a total sentence of seven years and four months in state prison: the high term of three years on one of the criminal threats convictions, doubled pursuant to the Three Strikes law; a consecutive term of 16 months for the other criminal threats conviction; and a concurrent term of six months for the hit-and-run offense.

## II.  DISCUSSION

Sufficient evidence supports the jury's finding that both Sally and James experienced sustained fear within the meaning

---

[2]    Undesignated statutory references that follow are to the Penal Code.

of section 422, subdivision (a). There is no abstract number of minutes or seconds a victim must experience fear; the test is whether the fear is more than momentary or fleeting. The jury could appropriately find this standard met on the trial evidence— most prominently, the evidence that both Sally and James were concerned defendant might be following them as they left the scene of the collision.

Defendant's contention that the trial court imposed a high term sentence on count one to punish him for exercising his right to a jury trial is forfeited for lack of an objection below and defendant does not contend otherwise (he instead asks only that we overlook the forfeiture). The record, in any event, does not support defendant's claim, which rests on a misreading of the court's comments during pre-trial plea negotiations and at sentencing. As we shall discuss, the trial court in pre-trial proceedings never specified the sentence it would impose if defendant chose to resolve the case without a trial, and none of the trial court's remarks indicate defendant's demand for a jury trial influenced its ultimate sentencing decision.

### A. Substantial Evidence Supports Defendant's Convictions for Making Criminal Threats

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic

communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-28; accord *People v. Turner* (2020) 10 Cal.5th 786, 826.) Defendant challenges the sufficiency of the evidence regarding the fourth element: whether Sally and James experienced sustained fear for their safety.[3]

Section 422 does not define "sustained fear," but, "[d]efining the word 'sustained' by its opposites," courts have held "that it means a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156; see also *People v. Brugman* (2021) 62 Cal.App.5th 608, 634; *People v. Roles* (2020) 44 Cal.App.5th 935, 942.) While precedent has observed, as a general matter, that 15 minutes is "more than sufficient" to satisfy the sustained fear requirement (see, e.g., *Allen, supra*, 33 Cal.App.4th at 1156; *Brugman, supra*, 62 Cal.App.5th at 634), there is no abstract

---

[3]     In his opening brief, defendant argued there is no evidence that James experienced any fear—sustained or otherwise. This argument is contradicted by James's testimony, and defendant concedes the point in his reply brief.

        We discuss Sally and James's fear for their own safety—as opposed to the safety of one another—because cousins are not "immediately family" for purposes of section 422, subdivision (b).

amount of time below which experienced fear only qualifies as momentary, fleeting, or transitory.  (See, e.g., *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 ["When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory'"]; *People v. Culbert* (2013) 218 Cal.App.4th 184, 190-191; see also *Allen*, *supra*, at 1156, fn. 6.)

This case is similar in material respects to *Fierro*, *supra*, 180 Cal.App.4th 1342, where the Court of Appeal affirmed a criminal threats conviction.  (*Id.* at 1347-1349.)  The threat there, like here, "stem[med] from what should have been a non-event between two motorists," and the defendant in *Fierro* aggressively asked the victims whether they wanted to "fuck with [him]" and raised his shirt to display what the victims believed was a gun "tucked into a waistband."  (*Id.* at 1344-1346.)  The defendant also said he ought to kill the victims "right now" and ordered them to "get the fuck out of here."  (*Id.* at 1346.)  The victims drove away and one called 911 "[w]ithin about 15 minutes—once he was on the freeway and 'out of harm's way' . . . and told the operator that he was 'scared shitless.'"  (*Ibid.*)

The *Fierro* court reasoned there was substantial evidence of sustained fear because "[t]he fear lasted not only through the minute or so that [the defendant] stood there exposing his weapon, but for up to fifteen minutes after [the father] drove away."  (*Fierro, supra,* 180 Cal.App.4th at 1348.)  But the *Fierro* court further observed that even excluding the time when the victims were on the freeway, "the minute during which [one of the victims] heard the threat and saw [the defendant's] weapon qualifie[d] as 'sustained' under the statute. . . . [Citation.]"  (*Id.* at 1348-1349.)

7

In this case, defendant made an unequivocal threat to shoot Sally and James accompanied by actions consistent with retrieving a gun from his car. Like *Fierro*, Sally and James did not immediately call 911 because they were concerned with escaping a dangerous situation, but they watched defendant as they left because they feared he might follow them. Like the victims in *Fierro*, Sally called 911 once she and James were out of harm's way—which supports an inference that they were in fear for the duration of their flight from the scene.[4]

Defendant, however, makes much of the fact that the prosecution's questions to the victims at trial about their fear were framed only in terms of their feelings in the "moment" that defendant threatened to shoot them. Even accepting defendant's parsing of those questions, that was not the only evidence the jury had before it to consider. In addition to the victims' admission of experiencing fear at the time of the death threats, they jury could also rely, as we have, on the victims' preoccupation with watching defendant when driving away minutes later, their decision to follow through and call the police several minutes after that (when they felt they were no longer in immediate danger), and the police detective's observation of their still "upset" demeanor when subsequently arriving to take a crime report.[5]

---

[4] Defendant's suggestion that Sally "calmly drove away" has no basis in the record. Sally testified she did not immediately call for help "[b]ecause [she] was scared in that moment and just wanted to get to a safer area."

[5] Defendant also argues Sally paused to photograph defendant's license plate before leaving the scene and directed

*B.*     *The Trial Court Did Not Punish Defendant for*
         *Exercising His Constitutional Right to a Jury Trial*
    *1.*     *Additional background*
        *a.*     *Pre-trial plea negotiations*

Before the case reached the judicial officer who presided at defendant's trial and sentencing, the prosecution offered defendant a plea deal wherein he would plead guilty to one count of making a criminal threat and the prosecution would recommend a sentence of 32 months in state prison and dismiss another separate case in which defendant was accused of making criminal threats.  Defendant rejected this offer.

Immediately before trial commenced, the trial court asked defendant (who was representing himself) whether he would accept the prosecution's earlier offer.  The prosecution indicated this offer was no longer on the table, but the trial court indicated it would "try to talk to [the prosecution] about trying to keep the offer open" if defendant was interested.

Addressing defendant, the trial court remarked, "So what I think you should understand, in evaluating it, is that you could be sentenced up to eight years and four months.  [¶]  And in

---

James to get in the car, which defendant believes are indications of rational behavior consistent with a quick recovery from initial fear.  The jury did not have to understand these actions in that matter, however.  Many crime victims thankfully have enough of their wits about them to document or recall the facts of a crime despite experiencing fear at the time.  Moreover, the jury could also weigh the acts defendant highlights against the other evidence of sustained fear that we have catalogued, and we do not reweigh that evidence under the applicable standard of review.  (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.)

addition, you could be sentenced to seven years and four months on your other case. [¶] They're willing to dismiss that other case. [¶] So you're—I just want to make sure, before I try to talk to them about trying to keep the offer open—because they just said they're done, and they're ready to go to trial, there's no point in me trying to talk to them about keeping the offer open, if you're not even interested in it, because might as well just be the trial. [¶] But what I'm trying to—I don't know anything about your case. [¶] All I know is that you're facing a lot of time . . . ." Defendant interjected, "I better win then," and the trial court continued, "Yeah. [¶] Because otherwise—and the reason I have this conversation before trial is because I've done over 100 jury trials. [¶] I've seen the defendants with regret, who have been— who have turned down an offer made by the government—and wished they hadn't. [¶] So I just want to make sure you fully are aware of everything you're facing so that you can't, later on, say 'Oh, I didn't know. I didn't know that I could be going to state prison for over 15 years.'"

Defendant then told the court why he believed 32 months was excessive, and the prosecution explained its position, including by citing defendant's criminal history. When defendant attempted to minimize his criminal history, the trial court pointed out that he had served "seven years in state prison" and emphasized "it's very hard for a court to go below, when someone's been to state prison . . . [¶] . . . [¶] and they've done that much time already, and there's other cases like this, it's hard . . . ." When defendant reiterated that "[32] months is just too high," the trial court replied, "Okay. [¶] I just want to make sure you understand ahead of time, because defendants who—I just don't want you to be shocked if you get convicted and you end

up getting the maximum sentence. [¶] Because you['ve] been to state prison before, you've done seven years before—it's very easy for a court to impose more." Defendant emphasized, "I just better win then, I guess, so I don't face eight years."

After more discussion of the merits of the case, the trial court additionally remarked, "I'm just trying to, before the jury comes in, try to—you say you're a business man. [¶] Mitigate your exposure. [¶] Control your risk. [¶] . . . [¶] Your risk is very high; okay? [¶] And it's not just because of this case; it's because of your history." Defendant replied that he was "aware that the court can make me an offer too," and suggested a 16-month sentence in exchange for resolving the case. The trial court replied that for it to "make that offer or whatever offer, I would want to hear what the victims had to say and find out a lot more information, and all sorts of things. [¶] So in other words, what you could do, if you want to do that, is you could plead open. [¶] And then, what I would do is I would hear a sentencing. [¶] That's an alternative as well. [¶] And then what I would do is I would hear what they wanted for sentencing, and I would hear what you want for sentencing, and then I would make a decision." The trial court emphasized it would not "matter whether [defendant] ple[ ]d to one charge here or three charges here" because of his "long criminal history." The trial court then suggested "another alternative," that defendant waive his right to a jury trial and do "a court trial for a lid, meaning that the most that the court would impose" would be the prosecution's offer of six years in state prison. Defendant, however, rejected these proposals.

## b.    *Sentencing hearing*

After trial, defendant was represented by counsel at sentencing.  The prosecution did not file a sentencing memorandum in advance of the hearing, explaining that defense counsel indicated she planned to request a continuance to prepare a mitigation packet.  The trial court responded, "I have got to tell you I am a little surprised that the People didn't file a sentencing memorandum.  This is set for sentencing today.  Regardless of what the defense was going to do, I would expect the People to file a sentencing memorandum.  That's what the court would have expected a representative from the People of the State of California to have done."

The prosecution apologized and recommended a sentence of "six years which was extended to [defendant] right before trial.  He's facing a maximum of seven years and ten months; three years times two for the first count and one-third of the mid term of 24 months, which is . . . eight months times two, for the second count, and the misdemeanor six months for the third count . . . ."

Defense counsel requested "the mid term."  In defendant's allocution, he acknowledged that, during trial, "I pretty much admitted that me and the guy almost got in a fight.  I admitted that I would kick his ass.  Not saying that that was okay.  Obviously I will be appealing this case so I am limited in what I can say, but I do want you to know that I accept accountability for my role in this incident, and I wish none of it happened."

The trial court stated, "Well, look, I obviously have reviewed the probation officer's report.  That recommendation is high term."  The trial court asked the prosecution why it chose not to present any victim impact statements, and the prosecution represented Sally and James were satisfied with the

recommended sentence of six years.[6]  The prosecution mentioned the trial court had previously advised defendant "of not only his maximum exposure here, given his criminal history not only in California, in other states, but also because of the—also the maximum exposure he was facing in his pending Burbank case . . . for, also, the criminal threats."  The trial court agreed and explained, "[f]rankly, that's why I am surprised the People are recommending a mid term sentence now after trial because that was what the court had indicated, is that the court would be sentencing to the high term, and the counts would be consecutive. I mean, I am surprised the People's recommendation is what the People's recommendation is.  That's why I wanted to make sure that the People had—because there's—you don't want to have any victim impact presented."

When the prosecution reiterated the victims felt a six-year sentence was fair, the trial court said, "Again, all I am trying to do is make sure the People have an opportunity.  If the victims would like to speak to the court to address the court regarding sentencing, that they have that opportunity, as the law requires, and that's what I am trying to find out from the People right now."  The prosecution said Sally and James did not want to miss work.

Proceeding to imposition of sentence, the trial court stated it had read the probation officer's report, which "recommend[ed]

---

[6]     The probation officer's report did not include statements from the victims.  The report explained the probation officer was not provided with a D.A. packet.  The probation officer attempted to contact the detective by phone to obtain the victims' phone numbers.  The phone call was unsuccessful.  A victim notification letter was sent by mail.

13

the high term." The trial court also "looked at [defendant's] extensive criminal history and . . . noted that he's been to state prison, you know, most recently for seven years as a sentence." The court then imposed the aggregate sentence of seven years and four months in state prison, including the high term on count one. The court explained it was "selecting the high term based on all of the aggravating circumstances; there being no mitigating circumstances including[ ] no expression of remorse." In his statement to the court, defendant was "clearly not acknowledging that he made the threat. The court [was] absolutely convinced that he did it based on the evidence that the court heard, and [the court was] actually sad to have to . . . sentence [defendant] to the maximum" in light of defendant's intelligence and skill in representing himself.

### 2. *Relevant legal principles*

The right to a jury trial in a criminal prosecution is a fundamental right under both the state and federal Constitutions. (*People v. Collins* (2001) 26 Cal.4th 297, 305.) "It is well settled that to punish a person for exercising a constitutional right is 'a due process violation of the most basic sort[ ]' [citation]," and a court "'may not treat a defendant more leniently because he foregoes his right to trial or more harshly because he exercises that right.' [Citation.]" (*In re Lewallen* (1979) 23 Cal.3d 274, 278-279; accord *Collins*, *supra*, at 307 ["The impropriety of a trial court's explicit promise of more lenient treatment in sentencing if the defendant waives trial by jury is comparable to the impropriety of harsher treatment imposed because of the defendant's having invoked his or her right to trial by jury"]; *People v. Clancey* (2013) 56 Cal.4th 562, 575.)

14

These principles, however, do not limit the trial court's discretion to impose a sentence in excess "of any negotiated pleas or sentences offered the defendant by the prosecution. The imposition of sentence within the legislatively prescribed limits is exclusively a judicial function. [Citation.]" (*Lewallen*, *supra*, 23 Cal.3d at 281.) "[U]nder appropriate circumstances a defendant may receive a more severe sentence following trial than he would have received had he pleaded guilty; the trial itself may reveal more adverse information about him than was previously known." (*Ibid.*) Accordingly, reviewing courts do not presume a retaliatory purpose from the mere fact that a defendant received a harsher sentence after trial than they would have received had they waived the right to a jury trial and entered a guilty plea. (*People v. Szeto* (1981) 29 Cal.3d 20, 35.) The defendant has the burden to show the trial court imposed a harsher sentence as a punishment for their decision to go to trial. (*Ibid.*; accord, *People v. Angus* (1980) 114 Cal.App.3d 973, 989-990 ["There must be some showing, properly before the appellate court, that the higher sentence was imposed as punishment for exercise of the right" to a probation revocation hearing].)

### 3. Analysis

At sentencing, defendant did not object or argue the court's sentence was imposed in retaliation for exercising his constitutional right to a trial. That means the point is forfeited. (See, e.g., *People v. Williams* (1998) 61 Cal.App.4th 649, 654-656 [a defendant who fails to object to another form of retaliatory sentencing—the trial court's imposition of a harsher sentence following a successful appeal—forfeits the issue].) Even putting aside the forfeiture, though, the claim is still unavailing.

15

The trial court's remarks during pre-trial plea discussions and at sentencing must be evaluated in their full context. During the pre-trial discussion, the trial court was gauging defendant's interest in an offer the prosecution had withdrawn. The trial court specifically declined defendant's suggestion that it offer an indicated sentence, emphasizing it "would want to hear what the victims had to say and find out a lot more information" first. The trial court also did not suggest its feeling that it would be "very easy" to impose a high sentence in defendant's case would not apply if he were to waive his right to a jury trial and plead open. More generally, the trial court said nothing to suggest defendant's decision to exercise his right to a jury trial would factor into its sentencing decision. This record therefore does not support defendant's argument that this case is analogous to *Collins*, in which the trial court told the defendant he would be "*getting some benefit*" by waiving his right to a jury. (*Collins*, *supra*, 26 Cal.4th at 302.)

At sentencing, the trial court referred to its earlier remarks—retrospectively overstating the certainty that a high term sentence would be imposed—to emphasize its surprise at the prosecution's recommended sentence. The trial court did so in response to statements by the prosecution suggesting it had misconstrued the trial court's concern regarding the lack of victim impact statements. Rather than thinking the prosecution's recommendation was *too high* in the absence of victim impact statements—as the prosecution apparently took the court to be saying—the court was instead expressing surprise the prosecution was undercutting the probation officer's recommendation, particularly in light of the court's pre-trial comments suggesting defendant's criminal history would make it

16

easy to impose a high sentence.  Unlike the trial court in *Lewallen*, the trial court was not expressing the view that a sentence following a guilty verdict should exceed a pre-trial offer.[7]

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM (D.), J.

---

[7]    Defendant's analogy to *In re Edy D.* (2004) 120 Cal.App.4th 1199 is also inapt.  In that case, the juvenile court stated that a more favorable disposition was not available to the minor because he inconvenienced witnesses by making them come to court.  (*Id.* at 1201-1202.)  Again, there is no indication in this case that defendant's decision to exercise his right to a jury trial factored into the trial court's sentencing decision.